UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


DEBRA K. ROBERTS,                    )
                                     )
                    Plaintiff,       )
                                     )
         v.                          )         No.  1:12CV177 NCC
                                     )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
                    Defendant.       )


## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Debra K. Roberts' application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et*

*seq.*  All matters are pending before the undersigned United States Magistrate

Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the

Commissioner's final decision is supported by substantial evidence on the record

as a whole, it is affirmed.

### I.  Procedural History

On January 7, 2010, the Social Security Administration denied plaintiff

Debra K. Roberts' November 3, 2009, application for disability insurance benefits

(DIB) in which she claimed she became disabled on December 31, 2003, because

of depression and a heart condition.  (Tr. 77, 79-82, 155; Suppl. Tr. 607-13.)  Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on March 15, 2011, at which plaintiff and a vocational expert testified.  (Tr. 34-75.)  On June 15, 2011, the ALJ issued a decision denying plaintiff's claim for benefits finding that, during her period of insured status, plaintiff was able to perform work as it exists in significant numbers in the national economy, and specifically, office cleaner, maid, and small parts assembler.  (Tr. 7-19.)  On August 29, 2012, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-5.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and specifically argues that the ALJ failed to consider all of the relevant evidence of record in determining her credibility and mental residual functional capacity (RFC).  Plaintiff also claims that the ALJ erred in discounting the opinions rendered by her treating psychiatrist.  Plaintiff requests that the final decision be reversed and that the matter be remanded for further consideration.  For the reasons that follow, the ALJ did not err in his determination.[1]

---

[1] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence.  However, inasmuch as plaintiff challenges the decision only as it relates to her mental impairment and not as it relates to any physical impairment, the recitation of specific evidence in this Memorandum and Order is

## II. Relevant Testimonial Evidence Before the ALJ

A.    Plaintiff's Testimony

At the hearing on March 15, 2011, counsel clarified that plaintiff's date last insured for Title II purposes was June 30, 2005, and that plaintiff must establish disability on or before that date.  (Tr. 38.)

At the time of the hearing, plaintiff was fifty-eight years of age.  Plaintiff has a college degree in health information management.  (Tr. 39.)

Plaintiff's Work History Report shows that plaintiff worked as a medical office administrator from 1990 to 1998.  From 1998 to 2003, plaintiff was self-employed doing medical billing.  From 2003 to 2006, plaintiff worked as a substitute teacher.  (Tr. 162.)  Plaintiff testified that she was self-employed on a part-time basis for three or four months in 2006 performing medical billing, with the goal that she would take over the billing responsibilities for the respective doctor.  (Tr. 43, 45.)  Plaintiff testified that the doctor did not keep her on because it was not a "good fit."  (Tr. 44.)  Plaintiff testified that she is also a member of the board of directors for her husband's commercial construction business, but that she has no duties with this position.  (Tr. 46.)

Plaintiff testified that she has experienced depression since she was fifteen or sixteen years of age and became unable to work beginning in 2003 because of

---

limited to only that evidence relating to the issues raised by plaintiff on this appeal.

her inability to organize and remember things. (Tr. 47, 61.) Plaintiff testified that she did not apply for disability benefits until 2009 because she did not feel well enough to undertake the application process. Plaintiff testified that new medication provided in 2009 "perked [her] up" enough to proceed. (Tr. 47-48.)

Plaintiff testified that she first underwent mental health treatment in the late 1990s but began consistently receiving such treatment in 2003. (Tr. 48.) Plaintiff testified that she has been prescribed different medications and underwent shock treatment in 2003. Plaintiff testified that her doctor has recommended that she undergo additional shock treatments. (Tr. 50.)

Plaintiff testified that, during the relevant period of alleged disability, she experienced problems with racing and suicidal thoughts as well as crying spells, stress, and anxiety. Plaintiff testified that she also had panic attacks during which her mouth would become dry, she would feel sick to her stomach, and she could not stand up. (Tr. 60-63.)

Plaintiff testified that she raised her son during the relevant period and attended his high school football games when she felt well enough to go. Plaintiff testified that her son played football all four years of high school and that she attended about half of his games. (Tr. 54-55.) Plaintiff testified that she did not volunteer for any school functions because she had difficulty interacting with people. (Tr. 58.) Plaintiff testified that she maintained her home during the

relevant period but did not shop for groceries because it involved leaving the house.  Plaintiff testified that she left the house once every week or two and only when she absolutely had to.  (Tr. 55.)  Plaintiff testified that someone came to deep clean her house every two weeks.  (Tr. 61.)

Plaintiff testified that she engaged in no hobbies or activities during the relevant period because she "slept for five years" (Tr. 57), sleeping up to twenty hours a day (Tr. 58).  Plaintiff testified that she would try to watch television or read a book but could not remember content.  (Tr. 61.)  Plaintiff testified that she would go seven to ten days without showering.  (Tr. 59-60.)  Plaintiff testified that she experienced bad days four or five days a week, resulting in her staying in her pajamas and lying on the couch.  Plaintiff testified that she could go to the grocery store and do laundry on good days.  (Tr. 62.)  Plaintiff testified that her current medication helps keep her awake.  (Tr. 52-53.)

Plaintiff testified that her work as a substitute teacher during the relevant period involved her responding to a telephone call the morning that the school needed a teacher.  Plaintiff testified that she accepted approximately every other call to teach.  (Tr. 56-57.)

Plaintiff testified that she has not vacationed in the past ten years.  Plaintiff testified that she was recently able to engage in some gardening the previous summer when she was given her new medication that perked her up.  (Tr. 57-58.)

B.    Testimony of Vocational Expert

James M. Englund, Jr., a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Englund classified plaintiff's past work as a medical biller as sedentary and skilled; and as a medical office administrator as light and skilled as actually performed by plaintiff, and sedentary as generally performed in the economy.  (Tr. 68.)

The ALJ asked Mr. Englund to assume an individual with plaintiff's education and past relevant work experience and to further assume the individual had no exertional limitations but was limited to simple, routine tasks in a low stress environment with only occasional decision making or occasional changes in the work setting, and only occasional interaction with the public and coworkers and supervisors.  Mr. Englund testified that such a person could not perform plaintiff's past relevant work but could perform other work such as office cleaner, of which 24,000 such jobs exist in the State of Missouri; maid, of which 10,000 such jobs exist in the State of Missouri; and small parts assembler, of which 15,000 such jobs exist in the State of Missouri.  (Tr. 70-71.)

The ALJ then asked Mr. Englund to assume the same individual with the same limitations, with one change being that the person was limited to no decision making.  Mr. Englund testified that such a person could perform the work as

previously described and at the same numbers as previously set out. Mr. Englund

testified that the person would not be able to perform such work, or any other

work, if maintaining quotas was required. (Tr. 71-72.)

In response to counsel's question, Mr. Englund testified that a person who

missed work two or three days a month on an unscheduled basis would not be able

to maintain any type of employment. (Tr. 72-73.)

### III. Relevant Medical Records Before the ALJ

Plaintiff visited Dr. Luis Giuffra on May 28, 2003, and complained of

feeling anxious and irritable with increased negativity. Plaintiff reported having a

history of major depressive disorder and that she had tried many antidepressant

medications in the past, including Prozac, Wellbutrin SR (WSR), Paxil, Celexa,

and Sinequan. Plaintiff reported that her sleep and appetite were okay. Plaintiff

reported her mood to change very quickly and that she had racing thoughts.

Plaintiff reported having crying spells and occasional death wishes. Mental status

examination showed plaintiff to be calm and cooperative. Plaintiff's mood was

euthymic, and her insight and judgment were noted to be fair. Dr. Giuffra noted

plaintiff to meet numerous criteria for adult attention deficit disorder (ADD). Dr.

Giuffra questioned whether plaintiff had bipolar disorder or ADD. Plaintiff was

assigned a Global Assessment of Functioning (GAF) score of 70.[2] Plaintiff was

---

[2] A GAF score considers "psychological, social, and occupational functioning on a hypothetical

prescribed Lamictal[3] and was instructed to return in one month. (Tr. 249.)

On June 9, 2003, plaintiff reported to Dr. Giuffra that she felt better but was agitated. (Tr. 249.) On June 25, plaintiff reported that she had "calmed down tremendously" and was doing better. Plaintiff reported that she continued to be "quick to tears," but her husband noted improvement. Mental status examination was normal in that plaintiff was well dressed and groomed; had logical and sequential flow of thought; clear sensorium; no suicidal or homicidal ideations; and no psychosis. Plaintiff was noted to be euthymic. Dr. Giuffra noted that plaintiff had three children with her and that she planned to take them to Six Flags. Plaintiff was prescribed Lamictal, WSR, and Trazodone[4] and was instructed to return in six weeks. (Tr. 248.)

On August 29, 2003, plaintiff reported to Dr. Giuffra that she was really down. Plaintiff reported having occasional crying spells and passive death wishes. Mental status examination showed plaintiff to have a dysthymic affect but was otherwise normal with no changes from the previous exam. Plaintiff reported

---

continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders*, *Text Revision* 34 (4th ed. 2000). A GAF score of 61 to 70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[3] Lamictal is used to treat bipolar disorder. *Medline Plus* (last revised Feb. 1, 2011)< http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

[4] Trazodone is used to treat depression. *Medline Plus* (last revised Jan. 15, 2014)< http://www. nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

being out of a job.  Plaintiff reported having some functioning difficulties with her

medications.  Dr. Giuffra noted that plaintiff stopped taking Trazodone on her own.

Dr. Giuffra instructed plaintiff to continue with WSR and to increase her dosage of

Lamictal.  She was prescribed Abilify[5].  (Tr. 247.)

On September 19, 2003, plaintiff reported to Dr. Giuffra that she felt great

for two weeks but was currently "very bad" and felt more depressed and anxious.

Plaintiff reported having poor sleep.  Dr. Giuffra instructed plaintiff to discontinue

Abilify.  Seroquel[6] and an antidepressant, Effexor, were prescribed.  (Tr. 247.)

Plaintiff visited Dr. Giuffra on October 9, 2003, and reported that she was

somewhat better but continued to be depressed.  Plaintiff reported having

anhedonia and that she spent most of her time in bed.  Plaintiff reported that she

did not want to do anything with her family.  Plaintiff reported having a low

appetite, increased sleep, and increased death wishes.  Plaintiff reported not having

any crying spells.  Mental status examination showed plaintiff to have a dysthymic

mood but was other normal.  Plaintiff reported that she got along well with her

husband and son.  Plaintiff was noted to tolerate her medications well.  Dr. Giuffra

---

[5] Abilify is used to treat episodes of mania in persons with bipolar disorder, and is used with an antidepressant when the antidepressant alone does not control symptoms of depression. *Medline Plus* (last revised May 16, 2011)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a603012.html>.

[6] Seroquel is used to treat bipolar disorder as well as with other medications to treat depression. *Medline Plus* (last revised Apr. 15, 2014)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a698019.html>.

noted plaintiff to have stopped taking Seroquel because it made her too sleepy. Plaintiff was instructed to discontinue WSR and to increase her dosages of Lamictal and Effexor.  (Tr. 246.)

On November 13, 2003, plaintiff reported to Dr. Giuffra that she was doing poorly.  Plaintiff had no suicidal ideations.  (Tr. 246.)

Plaintiff visited Dr. Giuffra on December 5, 2003, and reported that she was more depressed and slept all of the time.  Anhedonia was noted, and plaintiff reported that she did not want to leave the house.  Dr. Giuffra also noted psychomotor retardation.  Plaintiff expressed that she did not "want to live like this."  Plaintiff's mood was dysthymic, but mental status examination was otherwise normal.  Dr. Giuffra determined to admit plaintiff for ECT (electro-convulsive therapy).  (Tr. 244.)

Plaintiff was admitted to St. John's Mercy Medical Center on December 5, 2003, with an admitting diagnosis of major depression and a GAF score of 30.[7]  It was noted that plaintiff's depression was worsening, and she had failed numerous antidepressants.  It was also noted, however, that plaintiff had been poorly compliant with her medication.  Plaintiff was noted to be spending most of her time in bed and to have hypersomnia.  Plaintiff received three ECT treatments and

---

[7] A GAF score of 21-30 indicates behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or inability to function in almost all areas (*e.g.*, stays in bed all day, no job, home, or friends).

medication management during her hospitalization, from which she obtained some improvement.  Upon discharge, plaintiff agreed to continue with ECT on an outpatient basis.  Plaintiff was discharged on December 12, 2003, with a diagnosis of major depression and a GAF score of 50.[8]  Plaintiff's discharge medications included Effexor and Lamictal.  Plaintiff was scheduled to return for outpatient ECT on December 15, 2003.  (Tr. 191-214.)

Between December 15, 2003, and January 9, 2004, plaintiff underwent five outpatient ECT treatments.  (Tr. 577-95.)

Plaintiff visited Dr. Giuffra on January 14, 2004, who noted plaintiff to be taking a lower dosage of Effexor.  (Tr. 244.)  On January 19, plaintiff reported feeling about fifty percent better, and plaintiff's husband reported that she continued to improve.  Plaintiff reported eating better and not spending much time in bed.  Plaintiff had no death wishes.  It was noted that plaintiff had been able to do some work at home.  Dr. Giuffra noted plaintiff's mood to continue to be dysthymic, but mental status examination was otherwise normal.  A determination was made to hold off on additional ECT treatments, and plaintiff was made aware of the risk of relapse.  It was also noted that plaintiff was now taking Lithobid.[9]

---

[8] A GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

[9] Lithobid is used to treat bipolar disorder. *Medline Plus* (last revised Mar. 15, 2014)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html>.

Plaintiff was instructed to continue with Effexor. Nortriptyline (NT), an antidepressant, was prescribed. (Tr. 243.)

Plaintiff returned to Dr. Giuffra on February 9, 2004, and reported that she could not work. Plaintiff's husband reported that she had improved but was not 100 percent. It was noted that plaintiff slept well and had an increased appetite, but that her energy was low. Plaintiff's mood was noted to be dysthymic. Plaintiff was instructed to continue with her current medications, and Provigil[10] was prescribed. (Tr. 242.)

On April 22, 2004, plaintiff reported to Dr. Giuffra that she was "much, much better" and that she liked her "way of thinking." Some continued anhedonia was noted. Mental status examination was normal, and plaintiff's mood was euthymic. Plaintiff reported that she continued to spend extra time in bed, but that she was much improved in that regard. Plaintiff was instructed to increase her dosage of Provigil and to continue with her other medications. (Tr. 241.)

On June 24, 2004, plaintiff reported to Dr. Giuffra that she was functioning but did not feel right. Plaintiff reported being distractible, unable to make decisions, irritable, and isolating herself from friends and family. Plaintiff reported that she was unable to work. Plaintiff reported her sleep to be okay, but that her

---

[10] Provigil is used to treat excessive sleepiness caused by narcolepsy. *Medline Plus* (last revised Nov. 20, 2012)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602016.html>.

energy was low and her appetite had decreased. Plaintiff was instructed to discontinue Provigil, and Concerta[11] was prescribed. Plaintiff was continued on her other medications and was instructed to return in eight weeks. (Tr. 240.)

Plaintiff reported to Dr. Giuffra on August 19, 2004, that she was better and continued to improve but that she continued to have problems focusing. Plaintiff reported needing a midday nap. Plaintiff reported not being able to work more than two hours doing paperwork. Plaintiff reported her sleep to be okay, but that her energy was low and her appetite had decreased. Plaintiff had no crying spells and no death wishes. Mental status examination showed plaintiff to be mildly dysthymic but was otherwise normal. Plaintiff was continued on her medications and was instructed to return in two months. (Tr. 239.)

On October 19, 2004, plaintiff reported to Dr. Giuffra that she felt nervous all the time, could not make decisions, had a poor memory, was anhedonic, and had headaches. (Tr. 239.) On October 21, Dr. Giuffra noted plaintiff's voice to be flat. Plaintiff reported that she was not working, felt quickly overwhelmed, and was very nervous. Plaintiff reported having occasional panic attacks. Plaintiff reported that she did not shower daily and that she felt people looked at her funny. Plaintiff reported being indecisive as shown by her taking one hour to dress

---

[11] Concerta is used to treat narcolepsy. *Medline Plus* (last revised Mar. 15, 2014)< http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a602016.html>.

because she does not know what to wear, and not knowing what to buy when in the grocery store. Plaintiff was instructed to continue with Concerta and NT. Cymbalta[12] was prescribed. All other medications were discontinued. Plaintiff was instructed to return in one month. (Tr. 238.)

On January 26, 2005, plaintiff reported to Dr. Giuffra that she was doing better and was no longer taking Concerta. Dr. Giuffra noted plaintiff to be in better spirits and to be euthymic. Mental status examination was normal. Plaintiff reported her sleep to be okay, and her appetite was good. Plaintiff reported that she may have a job in a doctor's office. Plaintiff was instructed to continue with Cymbalta and NT and to return in three months. (Tr. 237.)

On April 27, 2005, plaintiff reported to Dr. Giuffra that she was doing well overall and did not feel depressed. Mental status examination was normal. Plaintiff was noted to be working doing collections for doctors. Plaintiff was continued on her medications and was instructed to return in three months. (Tr. 236.)

On July 26, 2005, plaintiff reported to Dr. Giuffra that her sleep, appetite, energy level, and mood were all okay. Plaintiff reported frequently needing to take a nap. Plaintiff reported having no crying spells. It was noted that plaintiff worked

---

[12] Cymbalta is used to treat depression and generalized anxiety disorder. *Medline Plus* (last revised Feb. 15, 2013)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

doing collections for four doctors.  Mental status examination was normal.

Plaintiff was instructed to continue with her medications and to return for follow

up in six months.  (Tr. 235.)

On October 19, 2005, plaintiff reported to Dr. Giuffra that she felt down

again.  Dr. Giuffra instructed plaintiff to increase her Cymbalta and to decrease her

dosage of NT.  (Tr. 235.)  On November 7, plaintiff reported that the adjustment to

her medication made her feel better and that she seldom felt sadness.  Plaintiff

reported her sleep to be poor, however.  Plaintiff was prescribed Lunesta.[13]  On

November 17, plaintiff reported that she was not doing well and was tired.

Plaintiff was instructed to discontinue NT.  On December 7, plaintiff reported that

she slept all the time, was sad, and felt "drugged" and in a cloud.  Plaintiff was

instructed to decrease her dosage of Cymbalta.  Carbamazepine (CBZ)[14] was

prescribed.  (Tr. 234.)

In 2006, plaintiff consulted and/or visited Dr. Giuffra on nine occasions.  In

January and April, plaintiff reported feeling better, being no longer depressed, and

having applied for a job.  In August and September, plaintiff reported not doing

well and having crying spells.  Dr. Giuffra noted that plaintiff would not undergo

additional ECT treatments.  In October and at the end of 2006, plaintiff reported

[13] Lunesta is used to treat insomnia.  *Medline Plus* (last revised Oct. 1, 2008)< http://www.
nlm.nih.gov/medlineplus/druginfo/meds/a605009.html>.

[14] Carbamazepine is used to treat bilpolar-I disorder.  *Medline Plus* (last revised July 16, 2012)

- 15 -

feeling better, less depressed, and becoming more active.  Throughout this period, Dr. Giuffra monitored and adjusted plaintiff's medications.  Plaintiff's mental status examinations continued to be normal, with occasional dysthymia noted.  (Tr. 227-33.)

In a Physician Statement of Disability completed on August 11, 2006, for plaintiff's insurance company, Dr. Giuffra reported that he had been treating plaintiff since May 28, 2003, for chronic, severe major depression from which she suffered marked limitations in that she was unable to engage in stress situations or engage in interpersonal relations.  Dr. Giuffra opined that plaintiff was unable to perform the duties of any occupation and first became disabled in January 2004. (Tr. 271-72.)

In 2007, plaintiff consulted and/or visited Dr. Giuffra on four occasions.  In February, plaintiff reported that it was difficult to leave her house.  In April, plaintiff reported experiencing increased sleep, crying spells, and distractibility. Dr. Giuffra completed another Physician Statement of Disability for plaintiff's insurance company on April 13 in which he reported plaintiff's condition to be unchanged and that plaintiff was totally disabled from any occupation and would be indefinitely.  By September, plaintiff reported feeling better and that she had discontinued some of her medications on her own.  Throughout this period, Dr.

<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html>.

Giuffra monitored and adjusted plaintiff's medications. Plaintiff's mental status examinations continued to be normal, with occasional dysthymia noted. (Tr. 223-26, 276.)

From February through August 2008, plaintiff visited Dr. Giuffra on three occasions and reported not doing well in that she did not leave her house, it took effort to do anything, and she experienced increased sleep and anxiety. It was noted during this period that plaintiff's husband was against additional ECT treatments. In August, Dr. Giuffra completed another Physician Statement of Disability for plaintiff's insurance company in which he reported plaintiff's condition to be unchanged and that plaintiff was totally disabled from any occupation and would be indefinitely. In October, plaintiff reported that she was doing well and was alert, and Adderall[15] was prescribed. In December, plaintiff reported doing well and that her mood was much improved with Adderall. Throughout this period, Dr. Giuffra monitored and adjusted plaintiff's medications. Plaintiff's mental status examinations continued to be normal, with occasional dysthymia noted. (Tr. 218-22, 278.)

Plaintiff visited Dr. Giuffra on two occasions in 2009–in February and May. Plaintiff was doing better and it was noted that she was working doing billing for a

---

[15] Adderall is used to control symptoms of attention deficit hyperactivity disorder. *Medline Plus* (last revised Aug. 1, 2010)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234. html>.

doctor.  (Tr. 216-17.)

Dr. Giuffra completed another Physician Statement of Disability for plaintiff's insurance company on September 18, 2009, in which he reported plaintiff's condition to have improved.  Dr. Giuffra continued to opine that plaintiff was totally disabled from any occupation and would be indefinitely.  (Tr. 280.)

On January 7, 2010, James Morgan, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he indicated that there was insufficient evidence to determine the extent to which plaintiff was affected by her mental impairment during the period from December 31, 2003, to June 30, 2005.  (Tr. 260-70.)

On February 25, 2010, Dr. Giuffra completed a Mental RFC Questionnaire in which he reported plaintiff's current GAF score to be 50, with her highest GAF score within the previous year to be 50.  Dr. Giuffra noted plaintiff's long history of difficult-to-treat depression with chronic waxing and waning of the illness and occasional periods of improvement.  Dr. Giuffra opined that, for an indeterminate amount of years, plaintiff was unable to meet competitive standards in remembering work-like procedures, maintaining attention for two-hour segments, maintaining regular attendance and punctuality within customary and usually strict tolerances, sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruptions from psychologically-based

symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, dealing with work stress, setting realistic goals, making plans independently of others, and dealing with stress of semiskilled and skilled work. Dr. Giuffra further opined that plaintiff also experienced serious but not preclusive limitations in her ability to understand, remember, and carry out very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; understand, remember, and carry out detailed instructions; interact appropriately with the general public; and maintain socially appropriate behavior. (Tr. 281-85.)

Between January and October 2010, plaintiff visited Dr. Giuffra on four occasions, who noted plaintiff to generally be doing okay. Plaintiff was continued on her medications throughout this period. (Tr. 299-302.)

Between May 2008 and November 2010, plaintiff visited her general practitioners at Kneibert Clinic for various physical conditions, including cardiovascular follow up, back pain, chest pain, rashes, and allergies. During these visits, plaintiff's diagnosed conditions of depression and anxiety were noted as well as her prescribed medications for such. (Tr. 303-421.)

On February 21, 2011, Sandy Reese, a family nurse practitioner with Cardiovascular Consultants of Cape Girardeau completed a Physical RFC Questionnaire in which she noted that, in addition to her physical impairments, plaintiff had severe anxiety and poor memory as well as a long history of depression with multiple medications and episodes of psychiatric counseling. FNP Reese reported that plaintiff's mental condition had waxed and waned, and opined that the condition would remain chronic. (Tr. 526.)

## IV. Records Submitted to the Appeals Council[16]

In a letter addressed to "To Whom It May Concern" and dated August 8, 2011, Dr. Giuffra wrote that plaintiff "was unable to sustain work at an employable pace between 2003 and 2005" and that he observed plaintiff on several occasions to have significant residual symptoms of depression during that time. Dr. Giuffra wrote that "[t]he fact that, at times, her mental status examination appears to be close to normal should not be interpreted as indicating that she has the functional ability to sustain the stressors of a regular job." (Tr. 599.)

Dr. Giuffra completed a Mental RFC Questionnaire that same date in which he reported on and rendered his opinion relating to plaintiff's mental impairment during the period of 2003 to 2005. In the Questionnaire, Dr. Giuffra reported

---

[16] In making its determination to deny review of the ALJ's decision, the Appeals Council considered additional evidence which was not before the ALJ. The Court must consider this additional evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d

plaintiff's GAF score to be 50 and that plaintiff had a fair and/or incomplete response to medication therapy and ECT treatments. Dr. Giuffra reported that plaintiff experienced pronounced fatigue as a side effect of her medications. Dr. Giuffra reported that plaintiff's impairment was severe, disabling, chronic, and had frequent exacerbations. As symptoms of plaintiff's impairment, Dr. Giuffra reported that plaintiff exhibited anhedonia, appetite disturbance, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, impairment in impulse control, persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, change in personality, paranoid thinking, isolation, pathologically inappropriate suspiciousness or hostility, easy distractibility, memory impairment, sleep disturbance, oddities of thought or behavior, and recurrent severe panic attacks. Dr. Giuffra opined that plaintiff had no useful ability to function with respect to her ability to maintain regular attendance and be punctual within customary and strict tolerances, to work in coordination with or proximity to others without being unduly distracted, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in

1441, 1444 (8th Cir. 1994).

a routine work setting, to deal with normal work stress, to carry out detailed instructions, to deal with stress of semiskilled and skilled work, to travel in unfamiliar places, and to use public transportation. Dr. Giuffra further opined that plaintiff was unable to meet competitive standards in her ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for two-hour segments; sustain an ordinary work routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; understand and remember detailed instructions; set realistic goals or make plans independently of others; interact appropriately with the general public; and maintain socially appropriate behavior. Dr. Giuffra reported that plaintiff's impairment or treatment would have caused her to be absent from work more than four days a month. (Tr. 601-04.)

## V. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through June 30, 2005. The ALJ found plaintiff not to have engaged in substantial gainful activity since December 31, 2003. The ALJ found that, through June 30, 2005, plaintiff had major depressive disorder that was partially controlled by medication, but that plaintiff did not have an impairment or

combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that, prior to June 30, 2005, plaintiff had the RFC to perform work except for "doing more than simple, routine tasks and in a low stress environment and with no decision-making and only occasional interaction with co-workers, supervisors or the general public." (Tr. 18.)  The ALJ found that plaintiff was unable to perform any of her past relevant work.  Considering plaintiff's age, education, work experience, and RFC as of June 30, 2005, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work existing in significant numbers in the national economy, and specifically, office cleaner, maid, and small parts assembler.  The ALJ thus found that plaintiff was not under a disability at any time beginning on or before June 30, 2005.  (Tr. 18-19.)

## VI.  Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is

declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's

impairments.

6.     The testimony of vocational experts when required which is
       based upon a proper hypothetical question which sets forth the
       claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted).  The Court must also consider any evidence

which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at

770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even

though two inconsistent conclusions may be drawn from the evidence, the

Commissioner's findings may still be supported by substantial evidence on the

record as a whole.  *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d

1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a

whole, we must affirm the administrative decision, even if the record could also

have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252

(8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex

rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ failed to consider all of the relevant evidence of

record in determining her credibility and mental RFC by discounting the opinions

rendered by her treating psychiatrist and by improperly focusing only on plaintiff's

isolated episodes of improvement.  For the following reasons, the ALJ committed

no legal error, and his decision is supported by substantial evidence on the record

as a whole.

A.    <u>Opinion Evidence</u>

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.  *See* 20 C.F.R. § 404.1527(f)(2)(ii).[17]  The Regulations require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. § 404.1527(d)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *Id.*; *see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).  This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion is not given controlling weight, the

---

[17] Citations to 20 C.F.R. § 404.1527 are to the 2011 version of the Regulations, which was in effect at the time the ALJ rendered the final decision in this cause.  This Regulation's most

Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 404.1527(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. *Id.* The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." *Id.*

The ALJ here discounted the opinion evidence rendered by Dr. Giuffra in his statements to plaintiff's insurance company and his February 2010 Mental RFC Questionnaire because his opinions were inconsistent with his treatment notes made immediately after each outpatient visit during the relevant period. The ALJ noted that, in these contemporaneous notes, Dr. Giuffra consistently described plaintiff to have a normal mental state and that, other than plaintiff's isolated ECT treatment in December 2003-January 2004, plaintiff's overall treatment consisted of routine office visits every two months and medication management with noted improvement. Indeed, as noted by the ALJ, by April 2005, plaintiff reported that she was doing well overall and did not feel depressed. While plaintiff argues that

recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this

the ALJ improperly relied upon this note to find plaintiff not disabled, a review of the record *in toto* shows this note to be similar to numerous other notations in plaintiff's treatment records during the relevant period where plaintiff reported being better, was euthymic, consistently yielded normal mental status examinations, and had resumed working.  Because the extreme limitations expressed in Dr. Giuffra's insurance statements and RFC Questionnaire are contrary to the multiple mental status examinations which revealed no signs of psychological abnormalities during the relevant period, the ALJ did not err in discounting Dr. Giuffra's opinions regarding plaintiff's mental abilities during this period.  *Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010); 20 C.F.R. § 404.1528(b) (signs of psychological abnormalities include abnormalities of behavior, mood, thought, memory, and orientation and must be shown by observable facts).  *See also Davidson v. Astrue,* 578 F.3d 838, 842 (8th Cir. 2009) (permissible for ALJ to discount opinion of treating physician that is inconsistent with the physician's clinical treatment notes); *Hacker v. Barnhart,* 459 F.3d 934, 937 (8th Cir. 2006); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (where limitations set out in a treating physician's assessment "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning," ALJ's decision to discount

---

discussion but does not otherwise change their substance.

treating physician's statement is not error).

Although plaintiff contends that her complaints during this period were consistent with her claim of disability, a claimant's statement of symptoms alone is not enough to establish a disabling mental impairment. 20 C.F.R. § 404.1528(a). "[O]bservable facts that can be medically described and evaluated" are required. 20 C.F.R. § 404.1528(b). Other than Dr. Giuffra's occasional observation of plaintiff's dysthymic mood, no observable facts of a psychological abnormality are shown in Dr. Giuffra's treatment notes.

Dr. Giuffra's August 2011 letter and RFC Questionnaire submitted to the Appeals Council do not alter this result. While Dr. Giuffra wrote that plaintiff's near-normal mental status examinations "should not be interpreted as indicating that she has the functional ability to sustain the stressors of a regular job," a medical source's opinion that a claimant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion that the Commissioner must credit. *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012); *Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005). Regardless, Dr. Giuffra's statement does not change the contemporaneous record evidence that shows no recorded observable facts of a psychological abnormality during the relevant period. To the extent Dr. Giuffra's August 2011 RFC Questionnaire lists extreme limitations, and indeed limitations more extreme than those expressed in

his February 2010 RFC Questionnaire, there continues to be no contemporary evidence of such limitations during the relevant period. As such, the ALJ's reasons to discount Dr. Giuffra's opinions would continue to apply to the extreme limitations set out in the August 2011 RFC Questionnaire.

Accordingly, it cannot be said that the ALJ's reasons to discount Dr. Giuffra's opinion evidence are not supported by substantial evidence. *Halverson*, 600 F.3d at 931. Because the ALJ provided good reasons that are supported by substantial evidence on the record as a whole, this Court must defer to the ALJ's determination. *Renstrom,* 680 F.3d at 1063-64.

B.     Periods of Improvement

Nor can it be said that the ALJ focused only on plaintiff's isolated periods of improvement to find her not disabled. A review of the ALJ's decision shows him to have considered plaintiff's reports of low energy, crying spells, inability to make decisions, and excessive sleeping when he weighed the evidence before him regarding plaintiff's functional abilities during the relevant period. As discussed above, however, the ALJ also noted plaintiff's consistent normal mental status examinations; that she tolerated her medications; that her medication regimen improved her condition such that she was not suicidal, was no longer depressed as of April 2005, and was doing well overall; that she was stable enough to work as a substitute teacher; and that her office visits every two months were sufficient for

her overall treatment.  While plaintiff's symptoms waxed and waned between appointments, as is expected with mental impairments, *see Miller v. Heckler,* 756 F.2d 679, 681 n.2 (8th Cir. 1985), the longitudinal picture shows plaintiff to have been, for the most part, appropriately logical and sequential in flow of thought, to have normal content of thought, to be well dressed and groomed, to have clear sensorium, and to have normal rate and rhythm of speech.  Indeed, the medical evidence of record shows nearly all of plaintiff's mental status examinations to show no abnormalities.  *E.g., Halverson*, 600 F.3d at 930.  Given that a claimant's level of mental functioning may seem relatively adequate (or, conversely, rather poor) at a specific time, proper evaluation of the impairment must take into account the claimant's level of functioning "over time."  20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00(D)(2).  This is what the ALJ did here.

A review of the ALJ's decision shows him not to have focused only on isolated instances of plaintiff's improvement to find her not disabled.  To the contrary, the ALJ properly considered the longitudinal evidence of record in determining the extent to which plaintiff's mental impairment affected her ability to engage in work-related activities prior to June 30, 2005.  The ALJ did not err in this consideration.  While a contrary conclusion may have been reached on this same evidence, it cannot be said that the ALJ's determination was not supported by substantial evidence.  *See Moore v. Astrue,* 623 F.3d 599, 603 (8th Cir. 2010);

*England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007).

C.     Credibility Determination

Plaintiff also claims that the ALJ erred by focusing on her isolated periods of improvement to discount her subjective complaints of disabling symptoms.  For the following reasons, the ALJ did not err.[18]

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.  *Halverson,* 600 F.3d at 931; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  While an ALJ need not explicitly discuss each *Polaski* factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints.  *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . .

---

[18] In a letter dated March 29, 2011, plaintiff's husband described the effects of plaintiff's mental impairment that he observed from 2003 to 2005.  (Tr. 573-74.)  In his written decision, the ALJ partially discredited the statements made in this letter.  (Tr. 17.)  Plaintiff does not challenge this determination.

under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. *Id.* at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan,* 239 F.3d at 962. The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005); *Pearsall*, 274 F.3d at 1218.

Here, the ALJ set out numerous inconsistencies in the record upon which he found plaintiff's subjective complaints not to be entirely credible. First, the ALJ noted plaintiff to have worked as a substitute teacher during the relevant period, observing that such work is not the kind of "low stress" job a person with a severe, uncontrolled mental impairment could perform. The record also shows plaintiff to have worked doing medical billing during this period and indeed to have reported within one month of June 2005 that she was working for as many as four doctors. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038-39 (8th Cir. 2001) (seeking work and working at a job while applying for benefits are activities inconsistent with

subjective complaints of disabling symptoms). The ALJ also noted that, other than plaintiff's isolated hospitalization for ECT, she was never hospitalized for any mental treatment nor received any treatment beyond prescription medication that was monitored every two or three months. *E.g.*, *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) (absence of hospitalizations, limited treatment, and employment during relevant period properly considered in credibility determination). The ALJ also noted plaintiff's medication regimen to be constant and consistent throughout the relevant period, although the record shows plaintiff to have demonstrated some noncompliance with such regimen by discontinuing some medications of her own volition. *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (evidence of noncompliance may be considering in evaluating claimant's subjective complaints). The ALJ also noted that despite plaintiff's testimony that she was not well enough to apply for social security DIB until 2009–although she claimed being disabled since December 2003–the evidence showed that she nevertheless filed disability claims with her private insurer prior to 2009 and was able to work as a part-time substitute teacher during such time, demonstrating that her belated filing may be based on something other than a belief that she was severely incapacitated. Statements that are inconsistent with the record provide valid reason, in themselves, to discredit a claimant's subjective complaints. *See Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (per curiam).

Finally, as discussed above, the ALJ noted that objective medical evidence did not support the severity of plaintiff's complaints to the extent she claimed she was unable to engage in any work-related activity during the relevant period. These reasons to discount plaintiff's subjective complaints are supported by substantial evidence on the record as a whole.

Contrary to plaintiff's assertion, the ALJ did not merely view isolated evidence of plaintiff's improved condition to discredit her complaints. Instead, a review of the decision shows that the ALJ examined the longitudinal record and discredited plaintiff's subjective complaints based on the inconsistencies throughout. In a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. *Renstrom*, 680 F.3d at 1065; *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

## VII. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled on or prior to June 30, 2005, is supported by substantial evidence on the record as a whole, and plaintiff's

claims of error should be denied. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir. 1992). *See also Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of July, 2014.